UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FREDERICK LEON PERKINS,
#397129,

    Petitioner,                                     Civil Action No. 17-CV-12413

vs.                                                 HON. BERNARD A. FRIEDMAN

BONITA J. HOFFNER,

    Respondent.
_____/

**<u>OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS,
DENYING CERTIFICATE OF APPEALABILITY, AND
DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS</u>**

        This is a habeas case filed by a Michigan prisoner under 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in Oakland County Circuit Court of unlawful imprisonment, Mich. Comp. Laws § 750.349b; assault by strangulation, Mich. Comp. Laws § 750.84(1)(b); and six counts of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b(1)(e). Petitioner was sentenced as a fourth-time habitual felony offender to 15 to 30 years of imprisonment for the unlawful imprisonment conviction, 12 to 30 years of imprisonment for the assault conviction, and 50 to 100 years of imprisonment for each first-degree criminal sexual conduct conviction. The instant petition raises two claims: (1) the prosecutor improperly injected religion as an issue at trial, and (2) petitioner was denied the effective assistance of trial counsel. The Court shall deny the petition because the claims are without merit. The Court shall also deny a certificate of appealability and permission to proceed on appeal in forma pauperis.

**I. Background**

        On the morning of September 12, 2013, a naked, beaten, and hysterical Alicia Willis appeared at the front door of a home in Farmington, Michigan. 9-1-1 was called. Willis

told responding officers that the previous night she had been brutally beaten and raped numerous times by petitioner at his neighboring house. Petitioner was subsequently charged with the offenses listed above.

At petitioner's trial, Willis testified that at the time of the incident she was living at a motel in Detroit. Petitioner contacted Willis through social media ostensibly to show her a rental property. Willis had dated petitioner for about six months in 2012, but she had not seen him since the end of the summer of 2012.

On the evening of September 11, 2013, petitioner picked up Willis at the motel. After they drove around for a short time, he took her to his house, where they ate, drank, and used cocaine. Petitioner demanded sex from Willis, and when she refused, he produced a handgun and placed it on a table. Willis then complied with petitioner's demands. During the sexual encounter petitioner choked Willis until she passed out. When she awoke, Willis found herself with her hands and feet tied together behind her back. Willis described being sexually assaulted by petitioner repeatedly throughout the night. She said petitioner inserted a gun into her vagina and hit her head and face with the gun and with his fist. Petitioner performed oral sex on her using his teeth, which she said was painful. Petitioner strangled Willis again until she lost consciousness. She awoke when petitioner re-inserted the gun into her vagina. Petitioner then attempted to insert the gun into her anus, failed, and hit her on the head with the gun. Petitioner inserted a black object with ridges into her anus. At one point petitioner forced the gun into Willis' mouth and she attempted to pull the trigger, believing that he was eventually going to kill her anyway. At another point petitioner urinated on the front of Willis' body while she sat on the toilet. Petitioner told Willis that he would not be able to take her home because of her injuries and that he would have to kill her. He told her that he would chop her body into pieces and spread them around Detroit.

In the morning, petitioner tried to take her into his garage to show her where he had hidden the body of her friend that he had killed, but she ran back inside the house. There, petitioner demanded oral sex. While receiving oral sex from Willis, petitioner put his head back and Willis fled from the house.

Willis testified that she could not remember with certainty the order in which each of these instances of sexual assault had occurred. Willis' description of the events at trial differed in some respects from what she told the police and medical personnel, and from her testimony at the preliminary examination, but prosecution witnesses testified that such inconsistencies are not uncommon given the circumstances.

Tiffany Pinkard, who lived down the street from petitioner, testified that at around 7:00 a.m. on September 12, 2013, Willis appeared at her front door, naked and crying, "Help me, help me, he's trying to kill me." Jury Trial Tr. I at 23. Pinkard let Willis come inside her house and called 9-1-1. Willis told the 9-1-1 operator that she had been kidnapped and raped, that she had broken free, and that she was afraid petitioner would find her and kill her. Pinkard saw injuries on Willis' face and head. The police arrived, and Willis and Pinkard directed them to petitioner's house and gave them petitioner's name and contact information. Responding paramedics treated Willis for injuries and transported her to the hospital.

The emergency room physician testified that Willis had a split lip, bruising on her face and neck, and tenderness, swelling, and bruising on the top and sides of her head. Willis' lip wound required seven stitches. The neck bruises were consistent with being strangled. An examination of Willis' external vaginal area revealed some blood and swelling in the area between the opening of the vagina and the opening of the rectum. Willis was given intravenous morphine for her pain.

3

A CAT scan showed swelling on Willis' facial bones. An ultrasound revealed bleeding between her uterus and her placenta – unbeknownst to her, she was eleven weeks pregnant. This bleeding was consistent with an object being used to forcibly penetrate her vagina. A subsequent examination at a sexual assault treatment facility revealed a split lip, swelling in the cheek and head, and broken blood vessels in the corners of the eyes, which was consistent with strangulation.

At around 8:00 a.m. on September 12, approximately an hour after Willis had appeared at Pinkard's front door, a number of police officers went to petitioner's address. Petitioner did not answer his phone and did not respond to a command to exit his house made over a patrol car's PA system. A SWAT team arrived at around 9:00 a.m. Petitioner finally emerged and was arrested without incident after the SWAT team pulled an armored car up to his door and through a loud speaker demanded that he come out. Inside the house officers smelled bleach emanating from the kitchen sink, which was filled with water and rags. Women's clothing was found wrapped in a towel in the bathroom. A pistol was found concealed between two box springs in the bedroom. A black rod was found on the bedroom floor. Willis' phone and other personal belongings were never found.

DNA analysis showed that Willis was the major donor of genetic material on the black rod and the barrel of the handgun retrieved from petitioner's house, as well as on a blood stain found on petitioner's living room floor. Y-STR tests showed petitioner as a possible donor of a sample taken from Willis' vulvar swab.

Petitioner's ex-girlfriend, Courtney Harris, testified about a sexual assault that occurred in June 2012. Harris testified that while she was in a car with petitioner he choked her twice and threatened her with a gun. Harris told police officers at the scene that petitioner had

4

helped her after she had been assaulted by someone else. But at petitioner's trial, she testified that petitioner drove her to his house where he raped her vaginally and anally, and inserted a bottle into her vagina and anus. Harris testified that she never reported the incident to the police.

Following his conviction and sentence, petitioner appealed. Petitioner's appellate counsel filed a brief on appeal in the Michigan Court of Appeals raising one claim, and petitioner filed a supplemental pro se brief raising three additional claims:

> I. The trial court erred in admitting the testimony of Courtney Harris regarding alleged past acts for which defendant was never formally charged, in violation of Rule 404(B), and thereby denied defendant his right to a fair trial.
>
> II. Trial counsel was ineffective for the following:
>
>> a. Failing to file a timely motion for investigator.
>>
>> b. Failing to subpoena defense witnesses.
>>
>> c. Failing to impeach complainant during trial phase.
>>
>> d. Failing to file a Rule 33 motion for new trial.
>>
>> e. Failing to seek experts' advice and opinion concerning DNA, medical reports, and forensic analysis.
>
> III. Prosecutor engaged in misconduct/abused discretion for the following:
>
>> a. Withholding discovery documents until one day prior to trial.
>>
>> b. Engaged in improper closing argument, attempting to mislead the jury.
>>
>> c. Vouched for the credibility of alleged victim, and Ms. Harris.
>>
>> d. Abused discretion, attempting to obtain a conviction at any cost, even using perjured testimony.
>
> IV. Trial judge abused discretion by:

> a. Submitting judge's opinion and order with 100% incorrect case facts, then made that order available to the jury, thereby violating defendant's right to a fair, impartial trial.
>
> b. Allowed the prosecutor to amend notice of 4th habitual intent sentence enhancement 21 days after arraignment of information, without a court order which is required and stated in MCL 767.76, and in MCR 6.112, notice must be filed within 21 days.

The Michigan Court of Appeals affirmed petitioner's convictions. *People v. Perkins*, No. 322593, 2015 WL 7078881 (Mich. Ct. App. Nov. 12, 2015). Petitioner then filed an application for leave to appeal in the Michigan Supreme Court raising the same claims. The Michigan Supreme Court denied the application by form order. *People v. Perkins*, 881 N.W.2d 811 (Mich. 2016).

**II. Standard of Review**

Section 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d)(1). Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law. "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (alterations added) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

6

facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (alteration added) (quoting *Williams*, 529 U.S. at 413; citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Thus, "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (internal quotation omitted).

**III. Analysis**

A. Improper Injection of Religious-Based Evidence and Argument

Petitioner first claims that the prosecutor improperly injected religion at trial during the examination of witnesses and during closing argument. Petitioner presented part of this claim – that the prosecutor improperly used a religious theme during closing argument – in his pro se supplemental brief filed in the Michigan Court of Appeals. The court analyzed this claim as follows:

> Defendant also contends that the prosecutor improperly remarked that "Frederick Perkins claims to be a man of God and he targets vulnerable women." Although a prosecutor may not make an inflammatory reference to a defendant's religion with no justification other than to arouse prejudice, the prosecutor did not do so in this case. *See People v. Bahoda*, 448 Mich. 261, 266 n.6; 531 NW2d 659 (1995). Instead, the prosecutor merely highlighted the inconsistency between defendant's claim that he is a religious person and his actions in this case. The prosecutor did not state defendant's religion or discuss in detail the fact that defendant was

> religious. Therefore, the prosecutor did not deprive defendant of a fair trial when she made the statement. *See id.*

*Perkins*, 2015 WL 7078881, at *8. As discussed below, petitioner has not shown that he is entitled to habeas relief on this aspect of his claim because he has not shown that the court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

The remaining portion of petitioner's claim – that the prosecutor improperly elicited religious-based testimony from witnesses – was not presented to the state courts and is therefore unexhausted. *See Wagner v. Smith*, 581 F.3d 410, 414-15 (6th Cir. 2009) ("A federal court may not grant a writ of habeas corpus unless the applicant has exhausted all available remedies in state court," and for exhaustion, "the state courts [must] be given the opportunity to see both the factual and legal basis for each claim."). The Court may nevertheless deny an unexhausted claim on the merits. *See* 28 U.S.C. § 2254(d)(2). Because petitioner's unexhausted claim is plainly without merit, the Court will take that course.

To be entitled to habeas relief on a prosecutorial misconduct claim, the petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (internal quotation omitted). If the misconduct was harmless, then as a matter of law, there was no due process violation. *See Greer v. Miller*, 483 U.S. 756, 765 & n.7 (1987). In federal habeas cases, this means asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

It is well settled that a prosecutor may not make remarks "calculated to incite the passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). A prosecutor may not inject a person's religious beliefs into trial to argue that those beliefs themselves establish the credibility or lack of credibility of a witness or to establish guilt. *See* Fed. R. Evid. 610; Mich. R. Evid. 610. Notwithstanding this rule, "[a] person's beliefs, superstitions, or affiliations with a religious group is properly admissible where probative of an issue in a criminal prosecution." *United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir. 1996); *see also United States v. Shalom*, No. 95-1768, 1997 WL 225514, at *4 (6th Cir. May 1, 1997).

Petitioner complains that the prosecutor asked Willis to identify a Bible in a photograph of petitioner's table and elicited testimony from her that petitioner claimed to be a minister or deacon. Jury Trial Tr. II at 15. Petitioner also takes issue with the prosecutor's questioning of Willis:

> Q: Ms. Willis, if there is one thing that you could not forget about this night what would it be?
>
> A: One thing. I almost ran out of the lady's house who I went to for help and I was going to keep it moving. But I don't want [what happened] to happen to anyone's daughter. . . . I don't want it to happen to another woman because you could easily be persuaded and swoon[ed] by a man who stands and says that he is a man of God and professes and proclaims to be a man of God and how he can help you – take you from your situation that you're in so bad in already and help you come back to Christ. And he used all of that and still be the devil in sheep's clothing.
>
> Q: Thank you.
>
> A: A wolf in sheep's clothing.

*Id.* at 91-92. In addition, petitioner challenges the testimony of Pinkard, who when asked by the prosecutor if she and petitioner had a dating relationship, testified that

9

> it was going in that direction, but it didn't end up to be that way. I was separated from my husband which was kind of one of the reasons I had befriended him. He said he was a – like a Christian counselor. . . . And then once my husband and I started talking again and kind of trying to work things out instead of encouraging me as a spiritual person to continue my relationship he was saying I shouldn't be doing that and just kind of downplaying my character which kind of turned me off and I was kind of like shame on you, you're supposed to be a person of God.

Jury Trial Tr. I at 31-32. Petitioner argues that these "references to [his] religiosity had an obvious impact upon at least one of the jurors prior to deliberations" because during the testimony of petitioner's cousin – who testified for the defense – a juror asked if she believed petitioner was a man of God, to which petitioner's cousin said yes. Pet. at 6; Jury Trial Tr. III at 64-65. Finally, petitioner again challenges the prosecutor's statement during closing argument that "Frederick Perkins claims to be a man of God and targets vulnerable women. . . . Frederick Perkins is a wolf in sheep's skin. Please find him guilty." Jury Trial Tr. III at 116-17.

The complained-of elicitation of testimony and argument by the prosecutor was not unfair because it was not aimed at injecting petitioner's religious beliefs into the trial to show that those beliefs themselves established a lack of credibility or to establish petitioner's guilt. Rather, part of the backdrop of the case was petitioner's act of holding himself out as a religious person to gain the trust of the two women he assaulted and the one woman who rejected him; it was part of the prosecutor's theory as to petitioner's *modis operandi*. The evidence was offered to help explain to the jury why Willis and Pinkard were attracted to and trusted petitioner. Therefore, neither the questions nor the argument presented by the prosecutor was improper. To the extent petitioner asserts that his attorney was ineffective for failing to object to the alleged misconduct, the claim fails because counsel is not required to make a meritless objection. *See Bradley v. Birkett*, 192 F. App'x 468, 475 (6th Cir. 2006).

Even assuming that the prosecutor's questions and argument were improper, petitioner would still not be entitled to habeas relief because he does not demonstrate that the prosecutor's alleged error "had a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 623, 637-38. The evidence presented against petitioner at trial was compelling. Willis testified to her harrowing experience at petitioner's house. She appeared at Pinkard's front door in the early morning, naked and hysterical. Her physical condition and injuries largely matched her description of the abuse. Petitioner did not comply with the police officers' orders that he exit his house until a SWAT team armored car was at his door. Inside petitioner's house, a gun and black object were found with Willis' DNA on them. Willis' blood was found on petitioner's living room floor. That the police smelled bleach and found the kitchen sink filled with water and rags could be interpreted as showing that petitioner had spent the morning attempting to clean. All of this evidence strongly corroborated Willis' testimony. Against this overwhelming evidentiary backdrop, petitioner has not shown that the few instances in which the prosecutor elicited testimony or made an argument about petitioner holding himself out as a man of God had a substantial impact on the result of the trial. *See McCary v. Lewis*, 255 F. App'x 78, 79-80 (6th Cir. 2007).

B. Ineffective Assistance of Counsel

Petitioner next claims that his trial attorney was ineffective for failing to call Robert Hardin and Edward Arrington as witnesses. Petitioner asserts that their testimony would have shown that he was at a funeral in Birmingham, Alabama from September 8 to September 10, 2013, and that upon his return on September 10 he was with Hardin until 5:30 p.m. Petitioner further states that he was with Arrington on September 11 until 8:00 p.m. He claims that the testimony of these men would have undermined Willis' testimony that she was with petitioner from

September 10, 2013, until her escape on the morning of September 12. Petitioner attaches to his petition an affidavit signed by Arrington along with a copy of his trial counsel's witness list, which lists both men as defense witnesses. The affidavit is dated March 29, 2017, and was not presented to the state courts.

To establish ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient, i.e., "that counsel's representation fell below an objective standard of reasonableness"; and (2) the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

The Michigan Court of Appeals rejected petitioner's claim as follows:

> Defendant also argues that defense counsel rendered ineffective assistance when he failed to interview or subpoena witnesses on defendant's witness list. However, defendant fails to establish the factual predicate for his claim because he does not indicate what the testimony of the witnesses would have been or how the testimony of each witness would have aided the defense. *See Hoag*, 460 Mich. at 6. Defendant also does not attach an affidavit of any of the witness. Therefore, defendant's argument fails.

*Perkins*, 2015 WL 7078881, at *5.

This Court may not consider the affidavit submitted by petitioner with his habeas petition because it was not part of the record before the state court when it adjudicated the claim. Habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563

U.S. 170, 181 (2011). Given the fact that the state court was proffered no evidence in support of this claim, that court reasonably rejected it. "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quoting *Strickland*, 466 U.S. at 689).

In any event, petitioner cannot demonstrate that he was prejudiced by his attorney's failure to call these witnesses. At the preliminary examination, Willis testified that she was picked up by petitioner on September 10, 2013. Prelim. Examination Tr. at 12-14. At the trial, the prosecution asked Willis an open-ended question about when the events transpired, referring to September 10 through September 12, 2013. *See* Jury Trial Tr. I at 146-50. Defense counsel then cross-examined Willis about her prior testimony indicating that September 10 was the date she was picked up by petitioner at the motel. Jury Trial Tr. II at 42-43.

The September 10 date was clearly a mistake on Willis' part and did not provide any basis for a substantial attack on her credibility. Willis appeared at Pinkard's door on the morning of September 12. Pinkard and the police witnesses established that fact beyond dispute. And Willis testified that the attack lasted from the prior evening – i.e., September 11 – until her escape the following morning. She did not claim to have been held captive for two days. Had petitioner called alibi witnesses to establish his presence somewhere else on September 10, 2013, through the evening of September 11, 2013, it would not have created a reasonable probability of a different outcome at trial. At most, it would have resulted in the prosecutor recalling Willis or presenting other evidence on rebuttal to correct the mistake and establish the fact that the attack occurred on the night of September 11, not September 10. Petitioner has failed to demonstrate that he is entitled to relief on this claim.

13

Because petitioner's claims are without merit, the Court shall deny the instant petition.

## IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability issues. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997). In this case, jurists of reason would not debate the Court's conclusion that petitioner has not met the standard for a certificate of appealability because his claims are devoid of merit. Therefore, the Court shall deny a certificate of appealability.

The Court shall also deny permission to appeal in forma pauperis because an appeal of this decision could not be taken in good faith. *See* 28 U.S.C. § 1915(a)(3).

## V. Conclusion

For the reasons stated above,

IT IS ORDERED that the petition for a writ of habeas corpus is denied.

14

IT IS FURTHER ORDERED that a certificate of appealability is denied. The Court also denies permission to appeal in forma pauperis.

Dated: May 23, 2019
Detroit, Michigan

**s/Bernard A. Friedman**
BERNARD A. FRIEDMAN
SENIOR U.S. DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on May 23, 2019.

Frederick Leon Perkins, 397129
Lakeland Correctional Facility
141 1st St
Coldwater, MI 49036-9687

s/Johnetta M. Curry-Williams
Case Manager